IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

CORY A. WATKINS,

                Plaintiff,

     v.

COMMISSIONER, SOCIAL SECURITY
ADMINISTRATION,

                Defendant.

No. 3:14-cv-01753-HZ

OPINION & ORDER

Alan S. Graf
Alan Stuart Graf P.C.
208 Pine St.
Floyd, VA 24091

        Attorney for Plaintiff

//

//

1 - OPINION & ORDER

Billy J. Williams
Acting United States Attorney, District of Oregon
Janice E. Hébert
Assistant United States Attorney
United States Attorney's Office
1000 S.W. Third Avenue, Ste. 600
Portland, OR 97201

Lisa Goldoftas
Social Security Administration
SSA Office of General Counsel
701 5th Avenue, Suite 2900
Seattle, WA 98104

      Attorneys for Defendant


HERNÁNDEZ, District Judge:

      Plaintiff Cory Watkins brings this action under the Social Security Act ("Act"), 42 U.S.C. §§ 405(g) and 1383(c)(3), for judicial review of the Commissioner of Social Security's final decision denying his application for disability insurance benefits ("DIB") under Title II of the Act and supplemental security income ("SSI") under Title XVI of the Act. Because the Administrative Law Judge ("ALJ") failed to properly consider the longitudinal records of Watkins's mental impairments, failed to give legally sufficient reasons for rejecting the opinion of Watkins's treating psychologist, and improperly rejected Watkins's testimony about the severity and limiting effects of his symptoms, the Commissioner's decision is reversed and this case is remanded for further administrative proceedings.

//

//

//

//

2 - OPINION & ORDER

## BACKGROUND

When ALJ initially denied his application for benefits in 2013, Watkins was twenty-five years old and living with his mother. Tr. 37.[1]  From a very early age, Watkins exhibited "significant emotional and behavioral disturbances . . . as a consequence of severe stressors including emotional, physical and possible sexual abuse; parental alcohol and drug use; prenatal exposure to alcohol and drugs; chaotic early life experiences; maternal depression; possible head injuries; and domestic violence[.]" Tr. 443. Watkins was admitted to state protective custody and placed in foster care at age eight. Doctors diagnosed him with Attention-Deficit/Hyperactivity Disorder ("ADHD") in early childhood, and he attended special education classes throughout his schooling; he completed the ninth grade and later obtained his GED. Tr. 597–98. He was hospitalized numerous times throughout his childhood, at ages 16, 12, and 7 for suicidal ideation. Tr. 598–99. Watkins previously received SSI as a child from late 1993 through early 2006, when his benefits were terminated because of his mother's income. Tr. 13.

As an adult, he continued to experience difficulties as a result of his mental impairments. He has struggled to find stable work or housing. He occasionally worked for family members— he worked a temporary job at his uncle's mushroom farm, and worked a short time for his father's construction company before he was fired. Tr. 42–43; 47–48. His longest paid employment lasted about two months. Tr. 597. He also "travels" impulsively—between 2010 and 2011, he spent a year "traveling with a backpack," hitchhiking and "staying in hotels or under bridges." Tr. 47, 597. He moved back in with his mother sometime in 2011, and now spends most of his days playing video games, preparing frozen meals, and walking his dog. Tr.

---

[1] Citations to "Tr." refer to the page(s) indicated in the official transcript of the administrative record, filed here as Docket No. 11.

48, 206.  His mother convinced him to report to a local emergency room in April of 2011 because he reported feeling suicidal. Tr. 282.

Watkins applied for DIB and SSI on April 15, 2011, alleging an onset date of July 15, 2007. Tr. 13. The Commissioner denied his application initially and after reconsideration. Tr. 108–115. After a hearing in April of 2013, Administrative Law Judge ("ALJ") Paul G. Robeck found Watkins was not disabled. Tr. 10–26. Watkins appealed, but the Appeals Council denied his request for review, making the ALJ's decision the Commissioner's final decision that Watkins now challenges in this Court. Tr. 1–7.

## SEQUENTIAL DISABILITY EVALUATION

A claimant is disabled if he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Disability claims are evaluated according to a five-step procedure. See Valentine v. Comm'r Soc. Sec. Admin., 574 F.3d 685, 689 (9th Cir. 2009). Each step is potentially dispositive. At step one, the presiding ALJ determines whether the claimant is engaged in "substantial gainful activity." If so, the claimant is not disabled; if not, the analysis continues. 20 C.F.R. §§ 404.1520(b), 416.920(b). At step two, the ALJ determines whether the claimant has one or more severe impairments. If not, the claimant is not disabled. 20 C.F.R. §§ 404.1520(c), 416.920(c). At step three, the ALJ determines whether the impairment meets or equals one of the impairments listed in the SSA regulations and deemed "so severe as to preclude substantial gainful activity." Bowen v. Yuckert, 482 U.S. 137, 141 (1987); 20 C.F.R. §§ 404.1520(d), 416.920(d). If so, the claimant is conclusively presumed disabled; if not, the analysis moves to step four. 20 C.F.R. §§ 404.1520(d), 416.920(d). At step four, the ALJ determines whether the

claimant, despite any impairments, has the residual functional capacity ("RFC") to perform past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). If the claimant cannot perform his or her past relevant work, the analysis moves to step five where the ALJ determines whether the claimant is able to do any other work in the national economy considering the claimant's RFC, age, education, and work experience. 20 C.F.R. §§ 404.1520(g), 416.920(g).

The burden to show disability rests with the claimant at steps one through four, but if the analysis reaches step five, the burden shifts to the Commissioner to show that a significant number of jobs exist in the national economy that the claimant could perform. 20 C.F.R. §§ 404.1520(e) & (f), 416.920(e) & (f); Tackett v. Apfel, 180 F.3d 1094, 1098–1100 (9th Cir. 1999). If the Commissioner demonstrates a significant number of jobs exist in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g)(1), 416.920(g).

## ALJ DECISION

The ALJ found that Watkins met the insured status requirement for DIB through June 30, 2009. Tr. 15. At step one, the ALJ found Watkins had not engaged in substantial gainful activity since July 15, 2007, his alleged onset date. Tr. 15. At step two, the ALJ found Watkins had the "following severe impairments: attention-deficit hyperactivity disorder, reactive attachment disorder—disinhibited type, and depression." Tr. 16. At step three, the ALJ found Watkins's impairments or combination of impairments did not meet or equal the severity of any listed impairments. Tr. 16–18. The ALJ next found that Watkins had the following RFC:

> [T]he claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: he is limited to simple, repetitive tasks, not detailed or complex tasks. He is limited to occasional interaction with coworkers, incidental contact with the public, and no production pace work.

Tr. 18. At step four, the ALJ found that Watkins had no past relevant work. Tr. 24. At step five, the ALJ found that Watkins was not disabled because jobs existed in significant numbers in the national economy that he could perform, including janitor and laundry worker. Tr. 25–26.

## STANDARD OF REVIEW

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); see also Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Id. The court must weigh all of the evidence, whether it supports or detracts from the Commissioner's decision. Martinez v. Heckler, 807 F.2d 771, 772 (9th Cir. 1986). If the evidence is susceptible to more than one reasonable interpretation, the court must uphold the decision. Andrews, 53 F.3d at 1039–40. A reviewing court must consider the entire record as a whole and cannot affirm the Commissioner by simply isolating a specific quantum of supporting evidence. Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006) (citation omitted).

## DISCUSSION

Watkins challenges the ALJ's decision on two grounds: 1) that the ALJ did not give sufficient reasons to reject opinions from several treating and examining medical sources; and 2) that the ALJ improperly discounted the credibility of Watkins's testimony about the severity and limiting effects of his symptoms. Plaintiff's Brief ("Pl. Br.") at 2. Underlying those points is his additional contention that the ALJ improperly ignored substantial evidence about Watkins's mental impairments that predated his alleged onset date. Pl. Br. at 2.

//

### 1.  Longitudinal Evidence of Mental Impairment

Watkins asserts that the ALJ erred by failing to properly consider medical evidence from dates prior to his alleged onset date, and evidence regarding his prior award for SSI benefits from 1993 through 2006. The ALJ explicitly gave "little weight" to two separate reports that predated Watkins's alleged 2007 onset date: a psychological evaluation from Steven Dickinson, Psy.D., completed in 2004, and a teacher's report about Watkins from D. Ross completed in 2001. Tr. 24. The ALJ rejected these opinions because they were written years prior to the alleged onset date and therefore did "not reflect [Watkins's] functioning during the relevant period." Tr. 24.

Social Security regulations state the Agency "will assess [a claimant's] residual functional capacity based on all of the relevant medical and other evidence" in the record. 20 C.F.R. § 416.945(a)(3). The Agency's assessment of mental impairments involves a "complex and highly individualized process that requires [the Agency] to consider multiple issues and all relevant evidence to obtain a longitudinal picture of [the claimant's] overall degree of functional limitation," including "all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication, and other treatment." 20 C.F.R. § 404.1520a(c)(1); see also Kimmins v. Colvin, No. 12-CV-4206-YGR, 2013 WL 5513179, at *7 (N.D. Cal. Oct. 4, 2013).

While the ALJ may be correct that Watkins's old records do not reflect his current functioning, Social Security regulations require the ALJ to consider these records as a part of a longitudinal analysis of Watkins's mental impairments. It is clear from the record that Watkins has struggled with the same set of mental impairments from a very early age. See, e.g.,Tr. 438 (comprehensive mental health assessment dated 3/8/1996; Watkins was eight years old); Tr.

485–92 (psychological evaluation dated 5/9/2001); Tr. 529–48 (thorough neuropsychological evaluation dated 4/10/2003). The reports and records from more recent providers repeatedly refer to Watkins's long-standing mental health issues. E.g., Tr. 266–67, 282, 320, 332.

Medical records from years prior are certainly relevant to the longitudinal picture of Watkins's mental impairments that the regulations required the ALJ to develop in this case, and the ALJ erred by rejecting Dr. Dickinson's opinion and the Ross report because they were too old. 20 C.F.R. § 404.1520a(c)(1); see also Kimmins, 2013 WL 5513179 at *9 ("the regulations explicitly require that the ALJ consider 'all relevant evidence to obtain a longitudinal picture of [a claimant's] overall degree of functional limitation' for mental impairments.").

Finally, the ALJ noted that Watkins was previously awarded Title XVI benefit from November 1993 through January of 2006, when the benefits were terminated because of his mother's income. Tr. 13. To receive benefits under Title XVI as a child, Watkins must have shown that he was not performing any substantial gainful activity, his impairments met the durational requirements, and his impairments met or equaled a listed impairment. Sullivan v. Zebley, 493 U.S. 521, 525 (1990). While not conclusive evidence of Watkins's current ability to sustain competitive employment, the ALJ should have explained the significance of Watkins's prior award, and what medical evidence in the record supported the conclusion that Watkins's mental impairments were no longer disabling a mere three years after he last received benefits. Kimmins, 2013 WL 5513179 at *9 (finding that ALJ erred by not providing an explanation for ignoring prior finding of disability).

## 2. Medical Evidence

Watkins also argues that the ALJ erred in rejecting the opinion of Watkins's treating psychologist, Dr. Aart Lovenstein. There are three sources of medical opinion evidence in Social

Security cases: treating physicians, examining physicians, and non-examining physicians. Valentine, 574 F.3d at 692 (citing Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995)). "As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant." Lester, 81 F.3d at 830. "The opinion of an examining physician is, in turn, entitled to greater weight than the opinion of a nonexamining physician." Id. The ALJ can reject the uncontroverted opinion of a treating or examining physician only for "clear and convincing reasons" supported with substantial evidence in the record. Orn v. Astrue, 495 F.3d 625, 632 (9th Cir. 2007) (quoting Reddick v. Chater, 157 F.3d 715, 725 (9th Cir. 1998)). Even if a treating or examining doctor's opinion is contradicted by another doctor, the ALJ can reject it only by providing "specific and legitimate reasons" that are supported by substantial evidence. Id.

Dr. Aart Lovenstein was Watkins's treating psychologist from November, 2012 through April, 2013. Tr. 614–46; 649–54. Dr. Lovenstein completed a Mental Residual Functional Capacity Assessment form for Watkins on April 16, 2013. Tr. 649–54. The form includes twenty different mental activities, for example "[t]he ability to understand and remember very short and simple instructions," or "[t]he ability to set realistic goals or make plans independently of others," and asks the medical provider to rate the patient as "Not Significantly Limited," "Moderately Limited," "Markedly Limited," or indicate if there was insufficient evidence to make a rating. Dr. Lovenstein assessed Watkins as "Markedly Limited" in eleven of the twenty activities, including understanding and remembering both detailed and very short, simple instructions; maintaining attention and concentration for extended periods; ability to complete a normal workday or workweek with interruption from psychological symptoms; maintaining socially appropriate behavior and cleanliness; ability to travel in unfamiliar places or use public

transportation; setting realistic goals; accepting instruction and responding appropriately to criticism from supervisors. Dr. Lovenstein rated Watkins as "Moderately Limited" in four other areas, including the ability to ask simple questions or request assistance; ability to get along with coworkers; responding appropriately to workplace changes; and the ability to sustain an ordinary routine without special supervision. Tr. 649–54.

The ALJ listed these limitations, but gave "limited weight" to Dr. Lovenstein's opinion "because the doctor's explanations do not support the severity of the limitations provided." Tr. 23. The ALJ stated that Watkins's "activities suggested a greater level of functioning." Tr. 23. "For example," the ALJ reasoned, Watkins "is able to use public transportation without difficulty. He shops in stores, rides the bus, and establishes relationships with women. He has traveled around the country on his own for weeks at a time." Tr. 23. Watkins also claimed to have made friends while traveling. That evidence suggested to the ALJ that Watkins could "function in public and interact with strangers." Tr. 23. The ALJ also noted that Watkins seemed to display his symptoms only "when performing tasks he does not like, such as work and chores," but that his ADHD symptoms did not prevent Watkins from playing video games up to ten hours a day, "a hobby," the ALJ wrote, "[Watkins] seems to thoroughly enjoy." Tr. 23.

The ALJ cited an opinion from a nonexamining mental consultant who concluded that Watkins could work if provided certain accommodations, including a limitation to only simple tasks which did not require long periods of concentration, and limited contact with the public. Tr. 22. Neither the ALJ, the Commissioner, nor Watkins analyzed whether the consultant's opinion actually conflicted with Dr. Lovenstein's opinion, and in turn whether the ALJ's rejection of Lovenstein's report is governed by the "clear and convincing" or the lesser "specific and legitimate standard." Under either test, the ALJ's reasoning does not pass legal muster.

The ALJ's primary error was focusing narrowly on the portions of the record that suggested Watkins was not seriously impaired, while ignoring substantial evidence showing otherwise. Edlund v. Massanari, 253 F.3d 1152, 1159 (9th Cir. 2001), as amended on reh'g (Aug. 9, 2001). For instance, the ALJ repeatedly references Watkins's "relationships with women" as an indicator that Watkins has  more robust functional abilities than Dr. Lovenstein assessed. Tr. 18, 23. But the evidence the ALJ cites in support of this assertion is a single line from an October, 2011, visit with a nurse at Multnomah County Health Department which states that Watkins had "[n]o [stymptoms] of STDs . . . Partners are women, uses condoms." Tr. 360. There is no reference whatsoever to a "relationship" with these women, and other evidence in record reflects that Watkins has never had a meaningful relationship with a significant other. In a 2011 psychological report, Dr. Hoffman stated that "[Watkins] has not had a significant romantic relationship, and has dated up to one month," Tr. 600, and that "[Watkins] seems quite isolated with no stable relationships or mentoring."Tr. 612. Dr. Lovenstein reported in November of 2012 that Watkins was a "25 y.o. single Caucasian man who lives with his mother. Has only had [two] brief one month relationships in his life (last 2010)." Tr. 618. Setting aside the ALJ's unfounded assumptions about the nature of Watkins's relationship with his sexual partner or partners, at the very least, the ALJ erred by ignoring other, more specific reports from Watkins's doctors about his lack of meaningful relationships.

The ALJ also selectively focused on Watkins's "travels" as indicative of a greater level of functioning without addressing conflicting evidence. True, Watkins repeatedly references "traveling," Tr. 266, or "want[ing] to see the world." Tr. 56. But when read in context, it is apparent that what Watkins refers to as "traveling" is essentially periods of itinerant homelessness, during which he spends weeks on the road, hitchhiking from place to place,

sleeping under bridges or "camping out" in his sleeping bag, and panhandling for money. Tr. 47,

266. Watkins explained as much to the ALJ during the hearing. Tr. 47. These "trips" are often

impulsive, "for example, he may wake up one day and decide to go camping for one month," Tr.

268. Watkins's impulsivity is reflected throughout the medical record. See, e.g., Tr. 277 (in

which Dr. Hoffman opines that Watkins's "behavior is likely to be reckless" and that his "desire

for new experiences may lead to period of nomadic wandering and make any long-term

commitments unlikely."); Tr. 290 ("When asked what he will do when he leaves the hospital,

Cory says he will probably just 'run away' by hitchhiking rather than pursue another job."); Tr.

354 ("As the session progresses, [Watkins] expresses more ambivalence about engaging with

providers and remaining with his mother and state casually 'I may have to leave soon and head

south—it's getting cold anyway.' "). The ALJ failed to explain how this impulsive wandering,

hitchhiking, and "camping out" under bridges is indicative of Watkins's ability to "function in

public" at higher level than Dr. Lovenstein assessed.

The ALJ's analysis of Watkins's ability to make friends is similarly myopic. Watkins did

claim to make "friends" while "traveling," but other reports note that while Watkins "sees

himself as a person with many friends," he was in fact "quite isolated with no stable relationships

or mentoring." Tr. 278, 281. The contradiction between what Watkins reports and the

assessments from his treating mental health providers hint at a common theme in Watkins's

records. As explained in more detail below, numerous psychologists discuss that Watkins often

attempts to present a positive picture of himself to other people, but that picture is nothing more

than a thin veneer masking a troubled individual. See Tr. 259, 276, 292, 480. Again, the ALJ

failed to mention this conflicting evidence of Watkins's social capabilities, and thus improperly

relied on a narrow slice of the record to support his conclusions about Dr. Lovenstein's opinion.

### 3.  Credibility

Watkins also contends that the ALJ gave insufficient reasons for rejecting his subjective complaints about the intensity, persistence, and limiting effects of his symptoms. An ALJ analyzes the credibility of a claimant's testimony regarding his subjective pain and other symptoms in two steps. Lingenfelter v. Astrue, 504 F.3d 1028, 1035–36 (9th Cir. 2007). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." Id. at 1036 (citation and internal quotation omitted). "The claimant, however, need not show that [his] impairment could reasonably be expected to cause the severity of the symptom [he] has alleged; [he] need only show that it could reasonably have caused some degree of the symptom." Id. (citation and internal quotation omitted). Second, if the claimant meets the first test, and there is no evidence of malingering, the ALJ can reject his testimony about the severity of his symptoms only by offering specific, clear and convincing reasons for doing so. Id. (citation and internal quotation omitted).

The ALJ may consider objective medical evidence and the claimant's treatment history, as well as the claimant's daily activities, work record, and observations of physicians and third parties with personal knowledge of the claimant's functional limitations. Smolen v. Chater, 80 F.3d 1273, 1283 (9th Cir. 1996). The ALJ may additionally employ ordinary techniques of credibility evaluation, such as weighing inconsistent statements by the claimant. Id.

At step one, the ALJ found that Watkins's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." Tr. 19. Watkins alleged suffering from fetal alcohol affect, posttraumatic stress disorder, depression with anxiety, insomnia, and attention-deficit hyperactivity disorder. Tr. 18. These symptoms, Watkins asserted, affect his

ability to talk, remember, understand, complete tasks, concentrate, follow instructions, and get along with others. Tr. 18. Because of his mental impairments, Watkins claimed he needed special reminders to take care of personal needs, grooming and hygiene, and to take medicine. Tr. 18. He claimed that he isolated himself from others, that he suffered from anxiety and panic attacks if around others for too long, and that he had trouble getting along with coworkers, supervisors, and the general public. Tr. 18–19. Finally, Watkins claimed he does not handle stress or changes in routine well, that he suffers from mood swings, and he "gets lost sometimes." Tr. 18–19.

The ALJ found at step two that Watkins's statements about the intensity and limiting of effects of his symptoms were not entirely credible. Tr. 19. The ALJ discounted Watkins's credibility based on his "work after the alleged onset of disability," his "job-seeking behavior," and polysubstance abuse. Tr. 24. The ALJ noted that Watkins "traveled around the western United States for a year by himself, stopping to work every once in a while," and that Watkins's claims of trouble getting along with people contradicted his testimony that he wished to "travel the world [and] meet people." Tr. 24. The ALJ also discounted Watkins's credibility because he sought only conservative treatment and did not comply with treatment recommendations, and that evidence in the record about his activities and grooming contradicted his reported troubles in these areas. Tr. 21–22. But the ALJ's reasoning again relies on a one-sided view of the record that does not properly account for the documented effects of Watkins's serious mental impairments, and therefore the ALJ erred by failing to give clear and convincing reasons for discounting Watkins's credibility.

First, the ALJ's reference to "work after the alleged onset of disability" is a gross mischaracterization of the record. The ALJ noted that Watkins "performed odd jobs in the neighborhood for some income," but the only evidence of such activity was Watkins's testimony

that he had recently repaired a hole in a neighbor's fence by "put[ting] a board up," an effort which earned him twenty dollars. Tr. 37. Similarly, there is no evidence of the extent of Watkins's work while traveling, and Watkins testified that he worked "when I was traveling—I was really hungry and out of money and there was—I asked if I could work there for a day for some food and a day's pay." Tr. 46. That Watkins may have begged out of desperation for one day of work does not reflect an ability to sustain a job and is not a clear and convincing reason for discounting his testimony.

Similarly, the ALJ mischaracterized Watkins's "job-seeking behavior." The ALJ reasoned that Watkins's "extensive job search activity suggests he is quite aware of his limitations and believes he can work despite them." Tr. 19, 22. The ALJ gave particular importance to a passage from Dr. Hoffman's report where Watkins claimed to have distributed "approximately 300" copies of his resume to "various places, including stores at the mall and businesses near his home." Tr. 19, 22, 266. The ALJ's reliance on Watkins's self-report that he visited three hundred businesses conflicts with evidence in the record that part of Watkins's pathology is that he "tends to present[] himself in favorable light," Tr. 276, or puts on "a most inappropriate façade of self-adequacy masking a very insecure person." Tr. 259. The record consistently reflects Watkins's inability to report an accurate picture of his abilities. For instance, in 2011 and again in 2013, Watkins told his treating psychologists that his career aspiration was to own a sailboat and take others on excursions, despite never having sailed before. Tr. 269, 622; see also Tr. 480 (a treatment plan from Parry Center Day Treatment Program which sets as a goal: "When making grandiose statements, Cory will be able to tolerate feedback from staff and peers.").

An exchange near the end of the hearing with the ALJ illuminates Watkins's tendency to overstate, and the problem with adopting the literal meaning of Watkins's statements. The ALJ asked Watkins if he could work at a very simple job with limited contact with others, and Watkins responded:

> A: I've spent 25 years looking for a job like that. . . .
> Q: Wait a minute. You started when you were two?
> A: No. I'm 25 now.
> Q: You didn't spend 25 years?
> A: No. Well, what I'm saying is I've been looking –
> Q: I know what you're saying.
> A: -- for a long time, and I've tried really hard on many, many jobs. . . .

Tr. 52. Given this testimony and the other evidence in the record, the ALJ could not reasonably rely on Watkins's claim that he applied to three hundred businesses as evidence of an "extensive job search" that was indicative of his ability to work.

The ALJ also discounted Watkins's credibility because he "received only conservative and routine treatment," and "declined medication to treat symptoms," noting that when Watkins did comply with treatment, his symptoms improved. A conservative course of treatment can be a legitimate basis for discounting a claimant's reports of severe symptoms. See Burch v. Barnhart, 400 F.3d 676, 681 (9th Cir. 2005). However, in the context of mental illness, "it is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation." Nguyen v. Chater, 100 F.3d 1462, 1465 (9th Cir. 1996); Rosas v. Colvin, No. CV 13-2756-SP, 2014 WL 3736531, at *11 (C.D. Cal. July 28, 2014) (finding that a claimant's failure to seek treatment for mental illness was not by itself a clear and convincing reason for discounting claimant's credibility). Accordingly, the Court does not find Watkins's failure to consistently seek treatment a clear and convincing reason to discount his credibility.

As for Watkins's substance abuse, the ALJ found evidence in the record that Watkins used marijuana and engaged in binge drinking, and concluded that Watkins's "alcohol and illegal drug use weaken[ed] his credibility because it show[ed] a pattern of voluntary injurious behavior." Tr. 22. But the ALJ's conclusion about Watkins's supposed drug or alcohol use is not supported by substantial evidence in the record, and thus it too is not a legitimate reason for discounting his credibility.

In April of 2011, Watkins told doctors that he used "cannabis 6 months ago," and had "1 beer 5 months ago." Tr. 286. The ALJ cited this as evidence of Watkins's drug use, but at the very same visit, Watkins's urinalysis was negative for marijuana, alcohol, and all other tested illicit substances. Tr. 288. The ALJ also cited a 2011 report in which Watkins told Dr. Alder that his "last alcohol was one beer three weeks ago and prior to that it was 1-2 years ago. His last drug use was marijuana 1-2 years ago and he denied any regular history of problems with alcohol/drugs." Tr. 332. Finally, the ALJ pointed to a report from October 2011 in which Watkins told doctors that he used marijuana in the past, but had not used in a "long time." Tr. 364. He also reported that he did not drink often, but when he did he "dr[a]nk a lot." Tr. 364.

These isolated references are not substantial evidence of a "pattern of voluntary injurious behavior." For one, there is no indication that Watkins was engaged in any contemporaneous use of drugs or alcohol, and the only objective evidence in the record, Watkins's April 2011 drug test, was negative for both marijuana and alcohol. Tr. 288. Additionally, there are numerous other reports in the record in which Watkins consistently denies currently using drugs or alcohol. Tr. 297 ("does not currently drink alcohol or use illicit drugs."); Tr. 302 ("rarely drinks"; "has smoked marijuana, but not for months."); Tr. 322 ("No current D/A issues. Smoked pot a long time ago. Last [alcohol] was 1 beer 6 m[on]ths ago."); Tr. 329 ("denies any use of intoxicants");

17 - OPINION & ORDER

Tr. 357 (October 2011 report noting that Watkins denied using marijuana in six months, drinking alcohol in about ten months). The ALJ did not mention this evidence, and such a selective reading of the record is not a clear and convincing reason for discounting Watkins's credibility. See Gallant v. Heckler, 753 F.2d 1450, 1456 (9th Cir. 1984) (explaining that the ALJ cannot "reach a conclusion first, and then attempt to justify it by ignoring competent evidence in the record that suggests the opposite result.").

The Commissioner makes several other arguments in support of the ALJ's credibility determination on the issue of Watkins's supposed drug and alcohol abuse, such as Watkins's inconsistent statements about his marijuana use. But the court cannot consider reasons not cited by the ALJ in making his credibility determination. Bray v. Comm'r of Soc. Sec. Admin., 554 F.3d 1219, 1225 (9th Cir. 2009) ("Long-standing principles of administrative law require us to review the ALJ's decision based on the reasoning and factual findings offered by the ALJ—not *post hoc* rationalizations that attempt to intuit what the adjudicator may have been thinking.") (citation omitted).

Finally, the ALJ discounted Watkins's credibility because of purported inconsistencies between his claimed limitation and his activities. Watkins "experiences symptoms of depression," the ALJ wrote, "but is able to shop in stores, prepare meals, perform household chores with his mother's prodding, play[] games with friends, travel, walk his dog, and go outside daily." Tr. 21. "Despite his symptoms," the ALJ continued, "[Watkins's] provider described him as well kempt and non-malodorous. He was easily engaged and made good eye contact. He was friendly and sociable." Tr. 21.

The ALJ's reasoning is erroneous in part because it relies on a selective view of the record that does not fully account for the effects of Watkins's mental impairments. As noted

above, numerous psychologists have noted that Watkins "tends to present himself in a consistently favorable light," and he "will usually present a cheerful and positive picture in the presence of others." Dr. Hoffman wrote that Watkins "may inwardly experience symptoms of depression, [but] these are not always outwardly apparent," and she noted a possibility that Watkins has a "Bipolar Type Disorder" that could account for this disparity.

The other reasons the ALJ gave for discounting Watkins's credibility are not sufficient because there is no conflict between Watkins's reported activities and his claimed limitations. Watkins claimed that his mental impairments make it difficult for him to remember things, complete tasks, follow directions, concentrate, and get along with others. Tr. 18. Watkins indicated the he shops for groceries, but he shops for a small quantity of items and only "when the food runs out." Tr. 205. On one recent shopping trip, Watkins told the ALJ he could not find his way home from the store. Tr. 44. His meal preparation is microwaving "frozen diners (sic)" for "however long the pakag ses (sic)." Tr. 204. None of these are inconsistent with Watkins's claimed limitations.

As explained above, Watkins's impulsive wandering is not indicative of higher mental functioning, and that he goes outside daily to walk his dog is not inconsistent with his reported limitations. Finally, regarding personal hygiene, the ALJ notes that one provider described him as "well kempt" but on the same page notes that another provider said he "smelled very badly." Tr. 21. Again, this is not inconsistent with Watkins's claim that he needs reminders from his mother to care for himself. Tr. 204.

In sum, the ALJ's reasons for discounting Watkins's credibility are not supported by substantial evidence in the record, and thus the ALJ erred.

//

**4. Remand**

Having established that the ALJ committed legal error in failing to consider Watkins's longitudinal records, rejecting Dr. Lovenstein's opinion, and discounting Watkins's credibility, the final question is whether to remand for additional proceedings or an award of benefits. Garrison v. Colvin, 759 F.3d 995, 1019 (9th Cir. 2014) (explaining that if "additional proceedings can remedy defects in the original administrative proceeding, a social security case should be remanded," but "in appropriate circumstances courts are free to reverse and remand a determination by the Commissioner with instructions to calculate and award benefits") (internal quotation marks omitted); Banks v. Colvin, No. 3:14-CV-01306-HZ, 2015 WL 4628031, at *6 (D. Or. Aug. 3, 2015) (Remanding for additional proceedings is the ordinary and "proper course," except in rare circumstances) (quoting Treicher v. Comm'r, 775 F.3d 1090, 1101 (9th Cir. 2014)).

The Ninth Circuit applies a three-part test to determine if a case is one of the "rare circumstances" justifying a remand for an award of benefits. Treichler, 775 F.3d at 1100–01. First, the ALJ must fail to provide legally sufficient reasons for rejecting evidence. Id. Second, the record must be fully developed and further administrative proceedings would serve no useful purpose. Id. Third, if the case is remanded and the improperly discredited evidence is credited as true, the ALJ would be required to find the claimant disabled. Each part must be satisfied to remand an award for benefits. Id.

The first part of the test is met here because, as explained above, the ALJ committed several legal errors in his analysis of Watkins's application for benefits. The next question is whether additional administrative proceedings would be helpful. In evaluating this issue, a court considers "whether the record as a whole is free from conflicts, ambiguities, or gaps, whether all

factual issues have been resolved, and whether the claimant's entitlement to benefits is clear under the applicable legal rules." <u>Treichler</u>, 775 F.3d at 1103–04.

Here, the ALJ failed to fully consider longitudinal records of Watkins's mental impairments. Additionally, it is not entirely clear that Watkins is unable to work. For instance, one doctor in 2011 noted that Watkins seemed to "fear that employment may result in a lifetime of unhapp[i]ness," but that doctor also believed that "a stable job could provide" Watkins with increased social support that could benefit his depression and other mental challenges. Tr. 293. And although Dr. Hoffman noted Watkins's many mental impairments, she did not rule out the possibility that he could work: "[W]atkins is likely to perform best in a work environment that is changeable and stimulating and involves physical activity. It may be useful to obtain feedback from a previous supervisor  . . . to clarify his strengths and weaknesses in the workplace." Tr. 612. Accordingly, a remand for additional proceedings is required to allow the ALJ to address these and other ambiguities in the context of Watkins's complete medical history.

## CONCLUSION

The Commissioner's decision is reversed and remanded for additional proceedings.


IT IS SO ORDERED.


Dated this ____15____ day of ____January____, 2015.

MARCO A. HERNÁNDEZ
United States District Judge